

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **DANE SMITH**, an individual, | Case No. 1:10cv769 (JCC/JFA) |
| Plaintiffs, | **THIRD AMENDED COMPLAINT** |
| v. | |
| **VMWARE, INC.**, a Delaware corporation; **CARAHSOFT TECHNOLOGY CORP.**, a Maryland corporation; | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

NIALL P. McCARTHY (admitted *pro hac vice*)
nmccarthy@cpmlegal.com
JUSTIN T. BERGER (admitted *pro hac vice*)
jberger@cpmlegal.com
ERIC J. BUESCHER (admitted *pro hac vice*)
ebuescher@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California  94010
Tel:  (650) 697-6000 / Fax:  (650) 692-3606

JEFFREY F. RYAN (CA Bar No. 129079)
jeff@jeffreyryanlaw.com
**LAW OFFICES OF JEFFREY F. RYAN**
455 North Whisman Road, Suite 200
Mountain View, California  94043
Tel:  (650) 691-1430 / Fax:  (650) 968-2685

*Attorneys for Qui Tam Plaintiff Dane Smith*

MARK P. FRIEDLANDER, JR. (Bar No. 4773)
mpfriedlander@verizon.net
**FRIEDLANDER, FRIEDLANDER & EARMAN, P.C.**
1364 Beverly Road, Suite 201
McLean, Virginia  22101
Tel: (703) 893-9600 / Fax:  (703) 893-9650

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    PARTIES ............................................................................................................ 3

III.   JURISDICTION AND VENUE ........................................................................ 4

IV.    THE BASICS OF VIRTUALIZATION .......................................................... 4

V.     DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY FALSELY
       INFLATING THEIR GSA SCHEDULE PRICE ........................................... 8

       A.    The Federal Supply Schedule .............................................................. 8

       B.    Carahsoft's GSA Contract .................................................................. 10

       C.    Carahsoft's Sales of VMware Products Through the MAS ................... 10

       D.    The Disparity Between Commercial Pricing and Government Pricing ............... 11

       E.    Defendants' Non-GSA Sales Are Also Based on False Claims and
             Information ......................................................................................... 13

       F.    Use of "Consolidation Ratios" and Other Means to Further Inflate
             Prices to the Government ..................................................................... 17

       G.    Defendants Overcharge the Government Further on Support and
             Subscription Services .......................................................................... 20

       H.    Additional Examples of Pricing Disparities ....................................... 21

       I.    VMware Set Up Carahsoft as a Sham to Attempt to Avoid False Claims
             Act Liability ....................................................................................... 23

VI.    DEFENDANTS KNEW THAT THEIR PRACTICES WERE ILLEGAL ............... 25

VII.   THE COVER UP BY VM WARE: RETALIATION AGAINST RELATOR .......... 32

VIII.  CAUSES OF ACTION ....................................................................................... 37

       FIRST CAUSE OF ACTION
       On Behalf Of The United States Federal False Claims Act,
       Presenting False Claims
       31 U.S.C. § 3729(a)(1)(A) ..................................................................... 37

i

**SECOND CAUSE OF ACTION**
On Behalf of the United States Federal False Claims Act,
Making or Using False Records or Statements Material to Payment or
Approval of False Claims
31 U.S.C. § 3729(a)(1)(B) ................................................................................. 38

**THIRD CAUSE OF ACTION**
On Behalf of the United States Federal False Claims Act,
Conspiracy to Commit Violations
31 U.S.C. 3729(a)(1)(C) ...............................................................................39

**FOURTH CAUSE OF ACTION**
(In the Alternative)
On Behalf of the United States Federal False Claims Act,
Retention of Proceeds to Which Not Entitled
31 U.S.C. § 3729(a)(1)(G) ..............................................................................40

    A.     Dane Smith's Personal Claims Against VMware For Wrongful
           Retaliation and Termination ...............................................................40

**FIFTH CAUSE OF ACTION**
Dane Smith Against VMware
Wrongful Retaliation in Violation of the False Claims Act
31 U.S.C. § 3730(h) ...............................................................................51

**SIXTH CAUSE OF ACTION**
Dane Smith Against VMware for Wrongful Termination in Violation of
Public Policy.........................................................................................52

IX.     **PRAYER FOR RELIEF**.................................................................... 54

     **DEMAND FOR JURY TRIAL**......................................................... 58

On behalf of Plaintiff UNITED STATES OF AMERICA, and on his own behalf, Plaintiff and Relator DANE SMITH alleges as follows:

## I.   <u>INTRODUCTION</u>

1.     This action alleges that, since at least 2000, Defendants have knowingly defrauded, and continue to defraud the United States by not providing government purchasers with comparable pricing, discounts, and sale terms as those received by Defendants' commercial customers, in violation of law.  As such, VMware, Inc. ("VMware") and Carahsoft Technology Corp. ("Carahsoft") (collectively "Defendants") have knowingly submitted false claims, made false statements, and conspired to defraud the federal government.

2.     Among other things, Defendants have defrauded the government by furnishing the General Services Administration ("GSA") with inaccurate pricing, inaccurate disclosures, and incomplete information about the sales of VMware software, licenses, and related maintenance, professional, and educational services.  As a result of Defendants' knowing submission of false pricing information, the government has paid higher prices on VMware products and services than it should have paid.

3.     Defendants' knowing submission of false and fraudulent claims for payment constitutes a violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA").  As a result of their fraudulent conduct, Defendants have caused the United States to sustain a direct loss of funds and damage to its interests.

4.     Defendants made false claims to Plaintiff United States for payment for products and services by misrepresenting the amounts that Defendants charged other customers for the same products and services, and by over-representing to Plaintiff United States the quantity of Defendants' products and services that Plaintiff needed.

1

5.      Defendants concealed the fact that they did not have a right to those payments by means of the false claims and representations described in this Complaint.

6.      VMware is the market leader in "virtualization" software technology. Virtualization software allows for the consolidation of multiple physical computers and servers into one. For example, a company with 100 physical servers, after purchasing VMware's virtualization products, will be able to perform the same amount of computing function with only 10 physical servers. The technology thus allows companies to cut down on hardware costs, energy costs, and space dedicated to physical servers.

7.      The technology is also useful to the government and its agencies, whose use of, and need for, robust computing systems are comparable to the biggest private companies in the world. In selling to the government, however, VMware and Carahsoft have systematically charged more than they charge comparable commercial customers for the very same products and services.

8.      Defendants have done so by violating express federal laws, regulations, and contractual terms that are designed to ensure that the government receives the best prices available.

9.      Defendants actively concealed the acts alleged herein from the government. Defendants never informed the government of the discounted prices they charged their other customers, and never informed the government that their prices on the GSA schedule were falsely inflated.

10.      This is precisely the type of conduct the False Claims Act is designed to combat. The FCA was originally enacted at the request of President Lincoln during the Civil War. The president believed that the Union Army was being defrauded by unscrupulous contractors. The Act was substantially amended by Congress in 1986 and 2009 to enhance the government's

2

ability to recover losses sustained as a result of defendants' fraud. At those times, Congress determined that fraud against the government was pervasive and that the FCA, which Congress described as the primary tool for combating government fraud, was in need of strengthening. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the government's behalf.

11.     Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States. 31 U.S.C. § 3729(a); 64 Fed. Reg. 47099, 47103 (1999).

12.     Based on the FCA, *qui tam* Plaintiff Dane Smith ("Smith" or "Relator") seeks to recover treble damages, civil penalties, attorneys' fees and costs, and other relief for the federal violations alleged herein, including retaliation in violation of the federal False Claims Act, 31 U.S.C. § 3730(h).

13.     Defendant VMware also committed violations of state law, including wrongful termination in violation of public policy. Smith seeks to recover all available damages, penalties, and other relief for the state violations alleged herein.

## II.   **PARTIES**

14.     The Plaintiffs in this action are the UNITED STATES OF AMERICA, through Relator and Plaintiff DANE SMITH, who also brings claims on his own behalf.

15.     Relator and Plaintiff DANE SMITH ("Smith") is a former employee of Defendant VMware.

16.     Defendant VMware, INC. ("VMware") (NYSE: VMW) is a Delaware corporation with its principal place of business at 3401 Hillview Ave., Palo Alto, California.  At all times relevant hereto, VMware conducted business in the Eastern District of Virginia.

17.     Defendant CARAHSOFT TECHNOLOGY CORP. ("Carahsoft") is a privately held Maryland corporation that distributes products, including those of VMware, to local, state, and federal governments.  It provides these products to the federal government through its contract, GS-35F-0131R, with the GSA.  Carahsoft's principal place of business is located at 12369 Sunrise Valley Drive, Suite D2, Reston, Virginia.

## III.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

19.     Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a), and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents can be found, reside, transact business, or otherwise engaged in fraudulent conduct within the district.

## IV.     THE BASICS OF VIRTUALIZATION

20.     VMware is the market leader in – and in fact has a near-monopoly on – "virtualization" software technology.  Virtualization software allows for the consolidation of multiple physical computers and servers into one.  For example, a company with 100 physical servers, after purchasing VMware's virtualization products, will be able to perform the same amount of computing function with only 10 physical servers.  The technology thus allows companies to cut down on hardware costs, energy costs, and space dedicated to physical servers.

4

**21.** The following pictures show a server room before use of VMware's virtualization software, and after:



**BEFORE**



**AFTER**

5

22.     VMware's virtualization technology is based on the fact that the vast majority of computer hardware is underutilized. For example, a typical desktop computer or server, at any given moment, will typically only be utilizing 10% or less of its Central Processing Unit's (CPU's) capacity. Virtualization allows multiple "virtual machines" to run on one CPU, thereby maximizing use of the CPU, and making the entire system more efficient. The virtualization technology consists of a layer of software that slides between the operating system and the hardware, allowing one physical machine to act as several machines, each with their own operating system and applications, as illustrated here:



///

23.    CPU efficiency can thus be increased from this:



To this:



As the world rapidly increases its need for computing capacity, VMware's virtualization technology has become indispensable to entities of all sizes. As a result, VMware has grown into the fourth most valuable software company in the world. VMware had total revenues in 2010 of over $2.8 billion, and has reported total revenues for 2011 of over $3.77 billion. VMware's growth has been explosive, having had only $700 million in revenues in 2006.

7

24.     Much of this growth is due to VMware's sales to the federal government.  As stated in a 2009 VMware press release:

> **"Our solid third quarter results were driven by strength in the US Federal sector, increased transaction volumes and particularly robust growth in our maintenance renewals,"** said Mark Peek, chief financial officer.

In 2011, VMware's CEO, Paul Maritz, emphasized how deeply VMware had penetrated the federal government, stating:

> VMware is deployed throughout the Executive, Legislative, and Judicial branches of the U.S. Federal Government, including the Department of Defense and all branches of military and joint commands, all Cabinet-level agencies, and many quasi-governmental agencies and NGOs.  The VMware vision for cloud computing in the federal government focuses on enabling agencies to adopt cloud while preserving existing investments.  With virtualization as the foundation, agencies can build cloud architectures that are flexible enough to support a unified private and hybrid cloud model.

## V.     DEFENDANTS VIOLATED THE FALSE CLAIMS ACT BY FALSELY INFLATING THEIR GSA SCHEDULE PRICE

### A.     The Federal Supply Schedule

25.     A plurality of VMware's sales to the federal government are through the General Services Administration's ("GSA") "Federal Supply Schedule" ("FSS"), or "Multiple Award Schedule" ("MAS").  Federal agencies can utilize the MAS to buy goods and services at a fixed price.  The MAS is created from hundreds of pre-negotiated contracts.  Procurement managers from government agencies can view these agreements and make purchases from the schedule, knowing that the contract terms and legal provisions have already been negotiated on their behalf.

26.     In order to participate in the MAS program, vendors must agree to disclose their "commercial sales practices" ("CSP"), which include:  (1) past commercial and government sales data, (2) discounts and concessions offered to their most favored customers, and (3) current

8

published commercial catalogs and/or price lists from which such discounts are offered. GSA also requires vendors to disclose if they deviate from their standard written pricing policies, and to include a discussion of the frequency and nature of those deviations. In addition, GSA requires that vendors provide pricing information that is current, accurate, and complete. 48 C.F.R. § 515.408, 48 C.F.R. § 552.212 70.

27.     GSA contracting officers determine whether the potential vendor's prices are fair and reasonable by comparing the prices and discounts that a company offers the government with the prices and discounts that the company offers to its commercial customers, as reported by the company. GSA attempts to obtain "Most Favored Customer" status for individual government purchasers, which means it seeks to obtain prices comparable to a vendor's best price to its most favored customers making similar purchases. 48 C.F.R. § 538.270.

28.     When the vendor does not have commercial sales to the general public, it must provide to GSA the manufacturer's sales data if the manufacturer's sales under any resulting contract are expected to exceed $500,000. The vendor must also obtain written authorization from the manufacturer for government access to the manufacturer's sales records for the purpose of verifying the sales data submitted by the manufacturer. *See* 48 C.F.R. § 515.408(b)(5).

29.     Another contract provision designed to protect the government is the "price reductions clause" ("PRC"), which ensures that initially awarded prices remain fair and reasonable throughout the life of the contract. Under the PRC, the contracting officer and the vendor agree, before the contract is awarded, on: (1) the customer (or category of customers) that will be the basis of the award (called the "tracking customer"), and (2) the government's price or discount relationship to the tracking customer (or category of customers). This relationship is maintained throughout the contract period. If the contractor reduces the tracking

9

customer's price at any time during the contract period, the government also receives the benefit of any such reduction.  48 C.F.R. § 552.238-75(a), (c).

30.　　VMware has sold its products to federal agencies through the MAS program for several years.  Various entities have entered into MAS contracts through which VMware products have been sold, and the allegations set forth herein apply to those entities.

### B.　Carahsoft's GSA Contract

31.　　Currently, Carahsoft holds a GSA contract, number GS-35F-0131R, for sales of general purpose commercial information technology equipment, software, and services.  The period covered by the contract is November 19, 2004, through May 7, 2012.

32.　　In January 2007, VMware products were added to Carahsoft's GSA contract.  As such, Carahsoft became the exclusive seller for VMware products to the federal government.

33.　　During the fourth quarter of 2007 alone, VMware had approximately 10,000 sales transactions totaling $264 million.  Of this amount, about 680 transactions, totaling $27 million, were sales to the federal government through the Carahsoft GSA contract.

### C.　Carahsoft's Sales of VMware Products Through the MAS

34.　　VMware and Carahsoft knowingly violated the GSA regulations by failing to provide the federal government with accurate and complete pricing information for their commercial and government sales, and by failing to report subsequent price reductions and discounts offered to commercial customers.  As a result, the federal GSA schedule contains falsely inflated prices for VMware's products (sold through Carahsoft, as described below).

35.　　As a result, all of Defendants' sales to the federal government through the MAS are based on fundamentally false information, and all claims for payment under those sales therefore constitute false claims.

10

**D.      The Disparity Between Commercial Pricing and Government Pricing**

36.      VMware's pricing structure is heavily discount-based.  VMware maintains a standard list price, which is decreased based on multiple discount programs.

37.      The list price for VMware's products is generally the same for commercial customers and government customers.  The discounts provided, however, vary wildly, with commercial customers receiving far more discounts.

38.      Based on the incomplete and inaccurate pricing data provided by VMware to the federal GSA, Defendants' listing in the federal GSA schedule provides for a 12% discount off of VMware's main product.

39.      This 12% discount does not even approach VMware's most favorable discount to commercial customers.  Indeed, the 12% discount is far less than VMware's average or median discount to commercial customers, and there are few, if any, commercial customers who do not receive a more favorable discount.

40.      Over the past several years, VMware has added multiple standard discount programs for commercial customers.  VMware has also added a few limited, discretionary discount programs for federal customers on top of the 12%.  Nonetheless, the disparity between VMware's standard discounts for commercial customers, and federal customers, remains staggering.  The following chart illustrates the disparity between VMware's standard discount programs:

/ / /

11



41.     There was never any legitimate justification for this discrepancy.  Indeed,
VMware offered governments outside of the United States better discounts than were offered to
commercial customers.

42.     In addition to VMware's standard discount programs, VMware often negotiates
ad hoc discounts for commercial customers in the form of contracts called Enterprise License
Agreements ("ELAs").  ELAs typically provide discounts even greater than are available through
VMware's standard discount programs.

43.     VMware also arranges some commercial deals through "Special Pricing Forms"
(SPFs), which provide additional *ad hoc* discounts on top of VMware's standard discounts.

44.     VMware did not report ELA or SPF pricing to the federal GSA, nor has VMware
updated the GSA with the commercial discount programs that it has rolled out since the GSA
price was set.  Accordingly, the GSA schedule, which was initially based on false information,

12

has grown even more fraudulent, and fails to provide the government with the best discounts available.

45.     As a result, all of Defendants' sales to the federal government through the GSA schedule are based on fundamentally false information, and all claims for payment under those sales therefore constitute false claims.

### E.     Defendants' Non-GSA Sales Are Also Based on False Claims and Information

46.     In addition to defrauding the federal government on sales made directly through the GSA schedule, the false information contained on the GSA schedule materially impacted Defendants' sales to the federal government that did not go directly through the GSA process. The GSA schedule price is the starting point for the negotiation of prices on government contracts that are greater than $500,000, which do not go directly through the GSA procurement process. Accordingly, the false information upon which the GSA schedule is based materially impacts and infects all such negotiations and resulting contracts, and any claims for payment under those contracts constitute false claims.

47.     For example, on March 29, 2009, Carahsoft entered into a "Blanket Purchase Agreement, DoD Enterprise Software Agreement (ESA)" (hereinafter, "BPA"), with the United States Department of Defense, for the sale of VMware products and services. Enterprise Software Agreements and Blanket Purchasing Agreements are a program of the Department of Defense's ("DoD") "Enterprise Software Initiative" ("ESI"). According to the DoD ESI's website, the ESI was formed in 1998, and its mission is to provide additional discounts off of the GSA schedule, as follows:

> DoD ESI is an official DoD initiative sponsored by the DoD Chief Information Officer (CIO) to save time and money on commercial software, IT hardware, and services. Through its joint team of experts, requirements are consolidated and agreements are established with IT

providers resulting in a unified contracting and vendor management strategy across the entire department. **In its first ten years of operation, DoD ESI achieved a cost avoidance of over $3 Billion off prices established on the GSA Federal Supply Schedule.**

(Emphasis added).

48.     The Carahsoft BPA is consistent with this mission and methodology. The Carahsoft BPA explicitly states its purpose as "to further reduce the administrative costs of acquiring commercial items from the General Service Administration (GSA) Federal Supply Schedule (FSS) Contract GS35F-0131R." As described above in paragraphs 17 and 33, GS35F-0131R is the Carahsoft GSA contract through which it sells VMware's products and services, and which is based on materially false information. The DoD BPA thus used the Carahsoft GSA prices as a starting point, and was explicitly designed to provide slightly better prices to the DoD than are available through the GSA contract.

49.     Unlike the Carahsoft GSA contract, the DoD BPA is **not** limited to purchases under $500,000. Instead, it applies to deals of any size, and provides the following additional discounts off of the GSA schedule, as follows:

| | |
|---|---|
| License Orders Under $50,000 | 1/2% |
| License Orders over $50,000 | 1% |
| License Orders over $300,000 | 2% |
| License Orders over $1,000,000 | 4% |
| License Orders over $5,000,000 | 5% |
| License Orders over $10,000,000 | 6% |
| License Orders over $20,000,000 | 7% |
| License Orders over $50,000,000 | 8% |

14

The BPA explicitly states that these "[d]iscounts are off of the GSA Schedule Prices in effect at time of order."

50.   In addition to misrepresenting to the DoD that it would receive VMware's best prices by adding a slight discount on top of the GSA schedule prices, Defendants were careful to exclude from the additional discounts their most lucrative product: "Support and Subscription" ("SnS") charges. As discussed below, ongoing SNS charges are the real money-maker for Defendants. By excluding SnS from the additional discounts provided through the DoD BPA, Defendants further limited any benefit conferred to DoD. Defendants' efforts to secure the DoD BPA were spearheaded by VMware, and specifically Aileen Black, the head of VMware's federal sales division (referred to as the "federal channel"). In a December 17, 2005 e-mail to her staff and supervisors, including Carl Eschenbach, Karthik Rau (then-head of VMware Product Management and Worldwide Marketing), and Yael Zheng (then-Vice President of Corporate/Worldwide Marketing), Black emphasized the importance of the DoD program and VMware's intention to apply for a BPA, writing:

> I am giving you a heads up on the VMware Federal effort for the Enterprise Software Agreement for the Department of Defense. In the short term I just need to make you aware. There is a ton of content on our web site. But if you can think of something that may help us please send. We will be coming to you over the next months for help on this effort. Having this in place puts VMware in a unique position against any competition.
>
> . . . .
>
> Very few companies have asked or make it on the list of companies with ESAs. (ORACLE , Microsoft, Symantec are a few) This is something the federal team has been working on for a year. We have been fast tracked by the OSD CIO Dennis Clem. This very important to our effort in the federal space. **This makes us a standard with a contract vehicle that all DOD organization and a few Civilian can automatically use without competing [for] the award. This is like heaven in the federal space.** We currently have customers pressuring this office. **We need to act fast if we want this very incredible opportunity.**

15

51.    Black attached to her e-mail a summary of the DoD ESI program, which highlighted the purpose of the program to provide DoD with the best prices available. Specifically, the summary stated:

> **Considerations in Transition to ESI Environment.** Among other terms and conditions ESI includes in its standard template for ESI ESAs are the following:
>
> 1. Most Favored Customer Prices. The prices under the ESI ESA will be at least as low as the prices that the publisher has under any other contract instrument under like terms and conditions. If at any time the prices under any other contract instrument become lower than the prices in the ESI ESA, the ESI ESA will be modified to include the lower prices.
>
> . . . .

(Emphasis in original).

52.    From the very outset, Black and other upper-level VMware management, including Carl Eschenbach, thus knew that the purpose of the DoD ESI program was to provide DoD with the best pricing available. Despite this knowledge, VMware management actively pursued the DoD BPA, allowing it to be based on the false information underlying the GSA schedule. The BPA was signed by Craig Abod, President of Carahsoft.

53.    As anticipated by Aileen Black, the DoD BPA has been highly lucrative for VMware and Carahsoft. In just three years, the Federal Government made over **700 purchases** of VMware products and services through the Carahsoft BPA, **totaling over $142,000,000**, all at falsely inflated prices. This amount even exceeded the expectations of the signatories of the Carahsoft BPA, which explicitly states: "The Government estimates, but does not guarantee, that the volume of purchases through this agreement will be **$100,000,000**."

54.    Worse still, on May 19, 2010, the Carahsoft BPA was converted into a "GSA SmartBUY agreement," and thereby was opened to **the entire Executive Branch of the United**

16

**States Government**. As of May 19, 2010, Defendants' false prices contained on the GSA schedule thus became the explicit basis for essentially **all** federal government purchases – both below **and above** the $500,000 threshold.

55.     VMware's products, services, and its false GSA pricing have become so pervasive that their virtualization technology is now embedded into government-wide Information Technology (IT) consolidation and cost reduction programs such as the U.S. Chief Information Officer's "25 Point Implementation Plan to Reform Federal Information Technology Management," as well as the U.S. Department of Commerce and National Institute of Standards and Technology's "NIST Cloud Computing Standards Roadmap" and NIST's "Guidelines on Security and Privacy in Public Cloud Computing" which provide the core direction in the United States Government's most aggressive IT plan ever to reduce costs by migrating key applications to the Cloud.

56.     On information and belief, in addition to the DoD BPA, there are other non-GSA contracts between Defendants and the Government that are directly based on the false GSA schedule, or that contain provisions that require Defendants to provide the Government with the best prices made available to commercial customers for the same products.  Defendants knowingly violated such contractual requirements by systematically charging the Government more than their other customers.

### F.     Use of "Consolidation Ratios" and Other Means to Further Inflate Prices to the Government

57.     In addition to charging the Government more per license of VMware's virtualization software than they should have, Defendants overcharged the Government in a second way:  intentionally over-representing the number of units that government customers needed to buy.

17

58.     For example, for a commercial customer needing to virtualize 100 physical servers, VMware might advise the customer that those 100 physical machines can be consolidated through virtualization onto only 10 physical servers.  Hence the customer will only need to purchase 10 licenses.  The number of physical machines that can be consolidated onto one machine is referred to by VMware as the "consolidation ratio."  In this example, the consolidation ratio would be 10:1.

59.     VMware's internally published acceptable consolidation ratio standard is between 4:1 and 6:1.  Any ratio higher than that was to be substantiated in writing and spelled out in detail in the ELA Template Worksheet circulated internally for approvals.  Ranges above 6:1 were intended to be permitted only under the most exceptional circumstances.  However, consolidation ratios far in excess of 6:1 for commercial customers were commonplace and there was no enforcement of internal policy requiring detailed rationale or explanations for the exceptionally high discounting for commercial customers.

60.     For a government customer, however, with the same number of physical servers, and the same basic computing needs, VMware will advise a lower consolidation ratio, such as 4:1.  With a 4:1 consolidation ratio, the government would have to buy 25 licenses, rather than just 10.  Moreover, the government would still be left with 25 physical servers, and all of the energy, hardware, and support costs associated therewith.

61.     Due to VMware's dominance of the market for virtualization software, most government purchasers lack the negotiating leverage, and the knowledge, to challenge VMware's assertion of the appropriate consolidation ratio.

62.     VMware thus essentially disguises additional discounts to its commercial customers, and sells the government more licenses than it wants or needs, by misrepresenting the

18

appropriate consolidation ratios for government purchasers. This occurs in many contracts with the Government – not just those that are established through the MAS.

63.     However, the impact is compounded in the MAS program, because Defendants fail to report the discrepancies in consolidation ratios to the federal GSA. The GSA schedule price is therefore higher than it would be otherwise.

64.     Consequently, Defendants' charges to the Government for VMware licenses and attendant services violate the False Claims Act.

65.     Defendants' upper-level management, executives, and directors were well aware of the discrepancies between consolidation ratios provided to commercial customers and those provided to the government. Among those to whom these discrepancies were reported were VMware's Vice President of Audit and Compliance, Susan Insley, the Audit Committee of the Board of Directors (including Michael Browne, Dennis Powell and Renee James), and CEO Paul Maritz.

66.     VMware management knew that the manipulation of consolidation ratios was potentially problematic, but believed that if the terms of commercial ELAs remained hidden, the manipulation would not be caught. Accordingly, VMware Senior Management often referred to ELA commercial pricing as "black box" ELA pricing. For example, VMware entered into an ELA with the UK Ministry of Defense that was far more favorable than a larger ELA entered into with the United States Navy Marine Corps Internet (NMCI) during the same time period. Jeff Littlejohn, then the Director of Systems Integrators and Outsourcing for VMware, expressed to Aileen Black and Carl Eschenbach his concern that the more-favorable terms of the UK deal would come to light. Littlejohn sought reassurance that the consolidation ratios and other key components of the UK ELA were hidden via the "black box ELA price" model. Eschenbach

responded by confirming that: "On ELA's we do not disclose discounting, it's a black box pricing model."

67.     Even worse than the consolidation ratio disparity, VMware offers many of its commercial customers contracts that allow for the **unlimited** addition of licenses during the term of the contract, at no extra cost.

68.     For example, in September of 2007, VMware offered eBay a contract for 1,000 licenses, at a discount of 53% off the list price. The 1,000 license figure was based on a recommended consolidation ratio of 8:1. In addition, VMware allowed eBay to add an unlimited number of additional licenses to the contract, at no further charge, for the two-year term of the contract.

69.     The terms of this eBay deal are of the type offered by Defendants' to their most favored commercial customers. The federal government should have received comparable terms, but did not.

### G.     Defendants Overcharge the Government Further on Support and Subscription Services

70.     Much of Defendants' revenues come in the form of "Support and Subscription" ("SnS") charges. All buyers of VMware's software must purchase SnS packages along with the software. Among other things, SnS services provide support, software upgrades, and software patches. The SnS packages vary in their term (usually one to three years) and in the level of support (*e.g.*, 12 hours per day phone support versus 24 hours a day phone support).

71.     Generally, the price for SnS services for commercial customers is set as a percentage of the net price of the software purchased (the list price less the discounts). Thus, for example, a commercial customer will be offered SnS for 20% of the net price of all of the

software purchased. If the customer pays $10,000 for software (discounted from a list price of $20,000), the customer will pay an additional $2,000 per year for SnS.

72.     Government customers, however, will typically be offered SnS based on a percentage of the list price of the software purchased. Thus, if a government customer pays $15,000 for software (discounted from a list price of $20,000), Defendants will charge the government customer 20% of the $20,000 list price for SnS:  $4,000 per year.

73.     SnS thus compounds the disparity between the discounts Defendants offer commercial customers and the discounts Defendants offer the government. Moreover, as with the software prices, SnS prices are listed on Defendants' federal GSA schedule, at an inflated price based on false and incomplete information.

## H.     Additional Examples of Pricing Disparities

74.     A typical commercial purchase is illustrated by Defendants' sale to Commercial Customer A ("Customer A") on December 28, 2007. The sale was for 794 VI3 licenses. The contract used a consolidation ratio of 7 to 1, offered a discount of 56% (actually 56.1828%) off the list price of the licenses, and priced the SnS services at 18% of the net price of the software for the 3-year term of the contract.

75.     Defendants also provided Customer A with an ELA that allowed an unlimited number of licenses to be obtained for free, meaning that it could legally download an infinite number of VI3 licenses and an infinite amount of SnS services on those licenses within the next 3 years at no additional cost. The unlimited ELA provision was valuable to Customer A because it had 8,000 servers with 16,000 CPUs and thus was likely to need additional licenses.

76.     For this sale, the average cost of each of the original 794 VI3 licenses was $2,519.50 ($5,750 list price x 794 licenses = $4,565,500; $4,565,500 - [$4,565,500 x .561828

21

discount] = $2,000,474; $2,000,474 / 794 licenses = $2,519.50). The SnS services for 3 years totaled $1,092,087.

77. A typical federal purchase comparable to the above commercial sale is illustrated by Carahsoft's sale to the United States Central Command ("CENTCOM") on January 24, 2008. The sale was for 460 VI3 licenses. This sale used a consolidation ratio of 4 to 1, a discount of only 39% on the licenses, and pricing at 21% of net on the SnS services for the 3-year term. In addition, the ELA was capped at 460 licenses. Thus, if CENTCOM wanted additional licenses, it would need to make another purchase, incurring additional costs for the licenses and additional costs for the SnS services on those licenses.

78. The average cost of each VI3 license on this federal sale was $3,507.50 ($5,750 list price x 460 licenses = $2,645,000; $2,645,000 - [$2,645,000 x .39 discount] = $1,613,450; $1,613,450 / 460 licenses = $3,507.50). Thus, federal purchaser CENTCOM paid 38% more on a per VI3 license basis than did commercial Customer A above.

79. In summary, the comparable characteristics of the two sales were:

|  | **CUSTOMER A** | **CENTCOM** |
|---|---|---|
| Number of VI3 Licenses | 794 | 460 |
| Consolidation Ratio Used | 7 to 1 | 4 to 1 |
| Discount on VI3 Licenses | 56% | 39% |
| Cost of SnS Services | 18% | 21% |
| Average Cost of VI3 License | $2,547.50 | $3,507.50 |
| ELAs | Unlimited number | Limited to 460 |

In addition to CENTCOM paying 38% more per VI3 license, CENTCOM's future SnS costs after the third year would be $569,381 per year for only a maximum of 460 licenses. By comparison, Customer A's future SnS costs each year after the third year would be $598,520 for as many licenses as it had wanted to download during the 3 previous years. Of particular significance in the federal sale is that CENTCOM's ELA was capped at 460 licenses. Thus, the

22

risk to VMware that CENTCOM would download additional VI3 licenses was not as great as that of Customer A, since CENTCOM only had 600 servers and 1,500 CPUs, compared to Customer A's 8,000 servers and 16,000 CPUs.

80.     If the lower 4 to 1 consolidation ratio–the ratio provided to the government–had been given to Customer A, this commercial customer would have had to purchase 1,389 licenses at an additional cost of $3,421,250, or 75% higher than it actually did.

81.     A table listing additional sales that demonstrate the difference in Defendants' charges to commercial customers and federal agencies is attached hereto as Exhibit A.

### I.     VMware Set Up Carahsoft as a Sham to Attempt to Avoid False Claims Act Liability

82.     VMware was aware that it faced false claims act liability for failing to provide federal and state governments with the same prices and discounts that it offered commercial customers.  Accordingly, in January 2007, in a misguided attempt to shield itself from liability, rather than list itself on the federal GSA schedule, it made a separate company, Carahsoft, the sole GSA schedule holder for VMware's products.

83.     This scheme is evidenced in e-mails written by Aileen Black, the head of VMware's federal sales division (referred to as the "federal channel").  For example, in her weekly report dated November 17, 2006, Black wrote:  "Carahsoft plan moving but need to keep on track for Jan 1.  We have got to move on the [Carahsoft] GSA business plan.  ORACLE had huge fine this week due to not handling this properly (I might add this is the second time!!).  If we set this up now correctly we will avoid difficult issues for the future."

84.     Similarly, in an e-mail dated January 23, 2007, from Aileen Black to CEO Diane Greene and other upper-management, Black officially announced the Carahsoft arrangement, and incorrectly stated that it "provides VMware with some added protection from the legal issues

regarding best pricing practices to the government." VMware and Black mistakenly believed that if they did not have a direct contract with GSA, they would not be caught overcharging the federal government.

85.     Carahsoft was thus nothing but a sham to attempt to shield VMware from liability for its knowing violations of pricing rules. VMware of course maintains tight control over Carahsoft and its practices. Carahsoft performs marketing functions controlled directly by VMware, and unlike a truly independent reseller, all deals made by Carahsoft with the government must be approved by VMware.

86.     As a result of this relationship, Carahsoft has quickly grown to be one of the top 100 government technology contractors in the United States. Carahsoft's revenues jumped from merely $91.9 million in 2006, to $834.5 million in 2010, and over **$1 billion in 2011.**

87.     Defendants also attempted to shield themselves from liability and justify the vast pricing disparity between commercial and government by falsely claiming that the software sold to the government was different than the software sold to commercial customers. It was and is not; the software is exactly the same. Defendants attempted to concoct a differentiation by labeling software sold to the government with a different SKU number – referred to as "Government SKUs". As discussed in the interview responses below, however, there was absolutely no difference between software products that carried Government SKU numbers, and the products sold commercially under standard SKUs. In fact, during much of the time that Defendants claimed to the government to have unique products with Government SKUs, internally Defendants had not even set up a separate Government SKU product line. The existence and legitimacy of Government SKUs was another false and fraudulent claim made by Defendants to the federal Government, for both GSA and non-GSA sales.

24

## VI.  DEFENDANTS KNEW THAT THEIR PRACTICES WERE ILLEGAL

88.     Defendants knew that the foregoing practices were illegal, as evidenced in multiple internal documents in Relator's possession.

89.     For example, in an e-mail from the head of VMware's federal sales, Aileen Black, to VMware's then-CEO Diane Greene, dated May 27, 2008, Black pitched a new proposed discretionary discount program for federal customers, and plainly informed Greene of the discrepancy between government discounts and commercial discounts, stating: **"BTW the max discount on this program is much less than the non-federal program (46% vs. 67%)."**

90.     Black attached to the e-mail an executive summary of the proposed discount program.  In that executive summary, provided to then-CEO Diane Greene, Black plainly acknowledged the effect of the disparity between available discount programs, stating: **"Federal margins have been significantly higher than commercial margins in the US . . ."**

91.     In the executive summary, Black also emphasized that a goal of her proposed new discount structure was to **"[c]onvert automatic Government discounts into discretionary discounts . . ."** In that way, Black could further limit and control the amount of discounts provided to government customers.

92.     Concerned that Black's new program perpetuated unlawful discrepancies between commercial and government discounts, two VMware employees, Leigh Madden and Steven Houck, put a hold on Aileen Black's proposed new program in order to conduct an internal investigation into VMware's federal pricing practices.  In response, Aileen Black, and her superior, Carl Eschenbach, expressed great frustration at the delay, and inquired about the reasons for the investigation.  Houck's response was as follows:

/ / /

> **As we were putting the program together Leigh and partners were raising concerns about the ethics and legality of our pricing practices in Federal. The team was meeting with disti prior to launch this past [week] and more serious concerns were raised. I checked with Leigh again and he expressed concern with us pricing our government deals at a higher price than what is Commercially available. This coming to a head on a current deal with EPA and Dell. I am being told that Aileen is strong arming pricing that violates GSA requirements. I have not verified this. Short of it. I don't want to put me You or VMware at financial or legal risk through the program.**

93.     A follow-up e-mail string from the same evening reiterated the same concerns regarding the discrepancy between federal and commercial pricing. In that string, Houck wrote: **"My concern is that we are institutionalizing a pricing practice that could be off sides."** At the time of these e-mails, Carl Eschenbach was the Executive Vice President of World Wide Field Operations at VMware.

94.     In another e-mail from the same period, Madden wrote Houck as follows:

> The original Federal program was based on pricing to our distributors at the same discount levels (20% or 25% depending on VIP tier) as the commercial program. There was concern amongst the VMware Finance team that this discount level would negatively impact our margins and the maximum distribution discount level approved by VMware Finance was 15%. The 12% or 15% distribution discount for the Federal program will put any partner using this pricing at an 8-10% disadvantage to any similar partner quoting commercial pricing . . . . **Our higher pricing to the US Government is not the industry norm and regularly results in questions from our partners as to why we charge the Government more than commercial customers. . . .**
>
> **We are required to disclose pricing differences between Federal and commercial pricing in our commercial sales practices chart which Carahsoft must submit to GSA as a part of their letter of supply submission.**

(Emphasis added.)

95.     As part of Madden and Houck's investigation, they conducted a series of interviews with VMware employees and resellers. The interviewees' responses reflect

widespread knowledge and concern regarding the discrepancies between commercial and government prices. For example, Question 4 asked: "Do you have any concerns about VMware's current partner programs or pricing practices?" Among the responses were the following:

- Yes. . . VMW positioning high pricing to Fed customer and partner knows we provide better pricing to commercial. Counter to what is expected.

- . . . The disparity between our Fed and Commercial programs creates a risk for VMware. Immix key tenet - Fed and commercial programs should look alike to minimize risk.

- I like seeing a program being prepared to develop standard practices. Advice - if Fed discount standards are different from commercial, need to justify w/ GSA. . .

96. Question 5 of the survey asked: "Were you made aware of the differences between our VMW Govt product vs. our commercial product and the additional warranties/benefits associated with the VMW Govt product?" The responses were as follows:

- No.

- No. **There is really no difference. Smoke and mirrors.** Different SKUs helped us w/ GSA and to eventually have tracking of Gov't business. It has never been clear. No write-up that I am aware of. Should include warranties in the EULA. All VIP agreements must specify use of appropriate SKU.

- No. Partners don't perceive any difference. They look at the comm. vs. Fed delta and quote commercial pricing open market.

- No.

- No

- Yes. It was explained one year ago. Customers are not aware. HP has different SKU structure for Federal - common criteria etc.

- No

- No

27

97.     Question 8 asked: "Is there anything else you would like to address regarding
VMware or the VMware Federal partner program?"  Among the answers were the following:

- To remove ambiguity - have GSA come in to review program before we launch it.  Ensure collaboration w/ GSA.  **Parity between commercial and Fed programs.  Must justify any deltas.**

- **Pricing to Fed Govt is higher than commercial - I am aware of this perception . . .   We are seeing most vendors w/ Commercial/Fed pricing parity. . .**

98.     In a power point document summarizing the results of the interviews, several
suggestions were made to alter VMware's federal pricing practices.  Among those were to:
"Remove commercial pricing advantage to create incentive for partners to use program pricing,"
and "Address concerns about pricing inequity to Gov't."

99.     The results of the investigation and interviews were shared with upper
management at VMware, all of whom knew of the GSA most favored customer requirements.
For example, in the executive summary Aileen Black provided to then-CEO Diane Greene on
May 27, 2008, discussed above, Black wrote that one of the "Program Objectives" was to
"[m]aintain compliance with Government [sic] Services Administration (GSA) commercial
practices comparison requirements."  (This, of course, was a purely self-serving, false statement
– management and executives knew that neither the original nor proposed discount programs
complied with GSA requirements.)

100.    Because of the vast discrepancy in discount programs between commercial and
federal, independent VMware resellers sometimes quoted the better commercial discounts to
federal government customers.  Doing so put Defendants at risk; they did not want federal
government customers knowing about the much greater discounts available to commercial
customers.  Accordingly, VMware management responded aggressively when resellers quoted

28

commercial discounts to federal customers. For example, in or about April 2006, Defendants rolled out a "VPP" discount program. Aileen Black vehemently prohibited application of the VPP discounts to government sales, despite internal opposition, including from Relator Smith. In an e-mail to Relator Smith, dated July 13, 2006, Black stated: "Fyi due to several issues including legal. This program will not be rolled out to FED."

101.   In March 2007, enhancements were made to the VPP discount program which increased the discounts in the first three bands by an additional 5% and lowered the management approval levels. However, the discounts were still not permitted to be used in sales to the government.

102.   Just a month later, in April 2007, the commercial channel launched a new discount program called "Advantage+" which provided discounts not related to volume of purchases. It increased a prior discount of 6% to a potential discount of 19%, representing a 10% base discount, an additional 6% rebate for selling to a new VMware customer, and an additional 3% when the sale involved the new "Solution Track" methodology. Elliot Fliesler, VMware's Senior Channel Demand Program Manager, sought to obtain Smith's signature on the Advantage+ program guide on April 4, 2007. In response to Fliesler's email to Smith and Black, Black sent an email to Smith on April 5, 2007, stating:

> These need to clearly state that these are not applicable to the Government sales direct or indirect. We already offer rebates in our program. You need to alter this before it goes out. Ed [Edward Gibson, Inside Sales Rep and later Federal Channel Sales Manager] can you make the suggested changes and send back to Dane. This is extremely important!!!!!!!!!!!!!!!!!!!!

Smith replied to Black the next day with "cc's" to Jennifer Baker ("Baker"), formerly employed by VMware as Channels Sales Manager, and Edward Gibson that: "First I heard that this should not count. I do not agree." As a result, Baker emailed to Smith that same day:

29

> Colleen (and Brandon and Alan) [Colleen Lenihan, Director of Channel
> Development, Brandon Sweeney, Director of Americas Channel Sales,
> and Alan Geary] are very aware that this new program can't be used for
> Fed customers .... When we first developed the Government Opp Reg
> program, we were unaware that this new program was being developed ...
> I think it's a huge disadvantage for Fed that the programs are different and
> that the new program is better than ours.

103.    Black continued to remind VMware management that the federal channel did not

have the same volume discounts and prices as the commercial channel.  She sent Amaury

Gallisa, formerly employed by VMware as Vice President of World Wide Channels, an email

regarding the VPP on June 25, 2007, stating:

> Again, I have pointed this out time and time again.  Do these documents
> note that this [does] not apply to the government?  I don't want to be
> chapter 2 in the investigation under EMC's situation.  WE still haven't
> gotten any response on the TPP program [the government's volume pilot
> plan that was rolled out in July 2007].  I am more than just [a] little
> frustrated and without being clear on this issue we are putting the
> company at risk.

104.    Black continued to be upset that VMware resellers were quoting government

buyers with the commercial discounts, and worried that by doing so, it would become clear to the

Government that it was not receiving the same prices offered to commercial customers.  In her

Weekly Report - Public Sector ("Report") to Smith and his management team on August 11,

2007, she stated:

> VPP continued to be "accidently" used with government accounts.  This is
> a serious issue.  TPP promo rolled out to help but still has continued.
> GSA is spending more time finding companies to fine (just ask SUN,
> EMC, and Oracle) than working on their day job.  It is very profitable
> when you fine folks 100 million.  This is serious. The times have changed
> and they are cracking down and cracking down hard.

105.    In March 2008, sales representatives from AltTech, one of VMware's authorized

resellers, sought to sell VMware products to the United States Department of Agriculture

("USDA") utilizing the Carahsoft GSA contract. AltTech had provided pricing information to

USDA based upon the standard commercial discounts it had previously used in its commercial

sales. However, VMware's federal channel prohibited AltTech from offering the standard

commercial discounts to the USDA. Leigh Madden ("Madden"), VMware's Director, Public

Sector Partner Sales, sent an email, dated March 13, 2008, to Brian Johnson and John Stubbs of

AltTech stating:

> There appears to be some confusion on your end. Reviewing our
> conversation yesterday:
>
> 1. I stated that Federal transactions were not eligible for commercial
> pricing/programs. This is clearly stated in VMware partner central and on
> the opportunity registration page. Currently we have only one dealer
> approved for Federal business - Carahsoft. We mistakenly accepted the
> S1 - USDA registration with AltTech manually added to the preferred
> distributor box, so we agreed to provide an AltTech discount of 25% for
> an Enterprise VAR plus an additional 6% for this transaction only. There
> was no discussion of any further discount or rebate nor applicability to any
> other deal.

106.   In a subsequent email to Brian Johnson and John Stubbs on March 20, 2008,

Madden stated:

> I want to follow up to our recent conversation regarding USDA with an
> email highlighting the specific programs referenced during those
> discussions. The following commercial discounts/programs are not
> applicable to VMware's US Federal Government business:
>
> 1. Advantage + Opportunity Registration
> 2. Advantage + New Account
> 3. VPP
> 4. Influence +
> 5. ELA Registration
>
> All existing VMware Federal Government channel discount programs are
> run through our Government Dealer Program. Carahsoft is currently the
> only authorized VMware Government Dealer. All reselling partners must
> register and transact Federal Government business using Federal
> Government discount programs through Carahsoft. We discussed the

31

USDA and DOE/INL transactions that were improperly priced by AltTech using commercial discount programs.

## VII.    THE COVER UP BY VMWARE:  RETALIATION AGAINST RELATOR

107.    As Relator Smith reported, investigated, and attempted to stop the fraudulent conduct of Defendant VMware, VMware attempted to cover up its scheme by threatening, discriminating against, and ultimately discharging Relator.

108.    Beginning in January 2009, Smith was asked to fully cooperate with VMware's ethics and compliance investigation involving Eschenbach and other VMware executives' fraudulent pricing practices of overcharging the federal government, partner and employee claims of unethical price fixing and restraints of trade, age and gender discrimination, and other acts of illegal workplace practices and corporate malfeasance.  The investigation was led by Susan Insley, Vice President of Internal Audit at VMware ("Insley").

109.    Smith took action to stop VMware's fraudulent practices and other illegal acts by fully cooperating with VMware Human Resources, Internal Audit, Compliance, and Ethics departments' requests for information by providing them with detailed reports when such violations occurred.

110.    As part of VMware's ethics and compliance investigation, Smith met with Lori Martinez, VMware's Director of Ethics and Compliance ("Martinez"), and Insley in February 2009 to report VMware's fraudulent pricing practices of overcharging the federal government, as well as other fraudulent and unlawful conduct by senior VMware executives.  These sessions took place during the course of three (3) days for approximately 18 hours.  Additionally, Smith exchanged emails and participated in phone calls with Martinez and Insley concerning VMware's fraudulent pricing practices and other unlawful conduct by senior VMware executives.

32

111.   During these internal federal pricing investigation sessions, Smith explained how Eschenbach and other senior executives at VMware manipulated federal pricing so that the federal government paid more than VMware's commercial customers.  They manipulated federal pricing by offering commercial customers a higher consolidation ratio (such as 10:1) than the consolidation ratio offered to the government (such as 4:1); providing greater discounts when selling to commercial buyers than when selling to the government through the Carahsoft contract; using different methods to price their support services for commercial customers and government purchasers, which resulted in lower annual maintenance prices for commercial clients than for government customers; and employing different terms and conditions in VMware's commercial business contracts than in Carahsoft's contracts for sales of VMware's products to the government.  Smith also presented detailed spreadsheets which evidenced the manipulation of the consolidation ratios by Eschenbach and other senior VMware executives.

112.   Beginning in or about the week of February 16, 2009, Insley met with, among others, Steve Houck and Carl Eschenbach to discuss VMware's internal federal pricing investigation into fraudulent pricing practices of overcharging the federal government, as well as other fraudulent and unlawful conduct by senior VMware executives, including Eschenbach and Scott Aronson, Vice President of Global Accounts.

113.   During the height of this internal federal pricing investigation, Smith was told to watch out and be careful around Eschenbach and Aronson because Eschenbach suspected that Smith had reported fraudulent federal pricing practices at VMware and blamed him for getting investigated in the first place.

114.   Aware of the dangers that Eschenbach, Aronson, and other senior VMware executives presented, Smith gave his wife specific written instructions in the event that he was harmed during a business trip to Europe.

33

115.   Several months later, Smith continued to take action to stop VMware's fraudulent practices and other illegal acts by giving deposition testimony in a matter filed by another former VMware employee, John Wheeler, against VMware.  VMware's in-house and outside counsel were present at the deposition.  On August 11, 2009, he testified regarding VMware's fraudulent federal pricing practices:

Q:   Have you ever seen or heard of any unfair pricing practices at VMware?  (163:12-13)

THE WITNESS: Yes.  (163:16)

Q:   Okay. Who has shared with you that they have seen unfair pricing practices at VMware? (163:22-23)

A:   My federal organization when I was in the role of the Americas. (163:24-25)

Q:   Who in your federal organization shared with you that they perceived or saw unfair pricing practices at VMware? (164:1-3)

A:   Steve Hauck. (164:4)

Q:   Anyone else beside Steve Hauck within the federal organization that shared with you his or her belief that there were unfair pricing practices within VMware? (164:18-21)

A:   Leigh Madden. (164:22)

Q:   Anyone else?  (165:3)

A:   Joel Davis.  (165:4)

Q:   Anyone else?  (165:5)

A:   Jennifer Baker.  (165:6)

Q:   What did Steve Hauck tell you about what he perceived or saw at VMware in terms of unfair pricing practices?  (165:9-11)

A:   He had received complaints from his channels employees that supported the federal group.  He had spoken with partners - this is what he shared with me - that were making strong claims of unfair

34

pricing or trying to prevent partners from being involved in opportunities.

He suggested that he knew that we were pricing the products differently in the federal space and that we had not done our due diligence on how to do that appropriately without creating an issue for same product, different price for the government. (165:12-22)

. . .

Q:    Okay.   When he was sharing these concerns with you about channel employees complaining, partners pricing in the federal space, and it just needed to be fixed quickly, was he asking you to support him in raising this with upper management? (166:15-19)

A:    Yes. (166:20)

Q:    And did you support him in raising this issue with upper management? (166:21-22)

A:    Yes. (166:23)

Q:    Who in upper management at VMware did you raise Steve Hauck's concerns about the channel employees complaining and the partners complaining about pricing-related issues and that it needed to be fixed quickly? (167:18-22)

A:    Brian Almas. (168:10)

Q:    Okay. (168:11)

A:    Carl Eschenbach, Leigh Madden, Brandon Sweeney, Joel Davis. There is no one else. (168:12-13)

Q:    During what period of time were you talking to Brian, Carl, Leigh, Brandon and Joel about the subject of these pricing issues at VMware? (169:1-3)

A:    Late spring, let's say May, June of 2008, July, August 2008. (169:4-5)

Q:    So why don't you tell me what the message you delivered to Joel, Brandon, Carl and Leigh meant. (169:13-14)

A:    Was that we had had a number of instances where people were concerned, that maybe we needed to look into this more deeply.

35

> That Steve was assembling a team, which I think was just a small
> group of people, to look into this in detail. (169:15-19)

Q:    What is "this"? (169:20)

A:    The potential Sarbanes-Oxley price - pricing parody or pricing
    concerns for the federal government, as well as channel conflict
    issues. (169:21-23).

116.    Approximately five months later, on January 10, 2010, Smith took further action to stop VMware's fraudulent practices and other illegal acts. He sent a detailed email to VMware employees Insley, Betsy Sutter, and Michelle Brennan, detailing numerous retaliatory acts by Eschenbach and other VMware employees against him for reporting VMware's fraudulent federal pricing practices and other illegal conduct and activities. Smith also expressed concern that he would suffer additional retaliation by Eschenbach and other senior VMware executives.

117.    Four days later, on January 14, 2010, VMware terminated Smith. VMware terminated Smith's employment as a retaliatory act against Smith for engaging in lawful acts in furtherance of an action under section 31 U.S.C. § 3729. (i) Smith cooperated with VMware Human Resources, Internal Audit, Compliance, and Ethics departments, and its internal federal pricing investigation in early 2009 into fraudulent VMware practices involving overcharges to the federal government. (ii) Smith gave truthful deposition testimony regarding VMware's fraudulent federal pricing practices in the John Wheeler matter in August 2009. (iii) Smith sent emails and made other reports to VMware concerning VMware's fraudulent federal pricing practices and overcharging of the federal government, and documented the retaliation and other discrimination he suffered by VMware through January 10, 2010.

118.    Shortly after Smith was terminated, Houck was forced to resign from VMware because he led the investigation in 2008 into VMware's federal pricing issues and enlisted Smith

36

to raise his federal pricing concerns to VMware's upper management (Brian Almas and Eschenbach). Houck, who reported to Eschenbach, Black, and Smith while he worked at VMware, also reported his concerns regarding VMware's federal pricing issues to his subordinates, including Leigh Madden, Brandon Sweeney, and Joel Davis, and others at VMware. Smith reported Houck's concerns regarding VMware's federal pricing practices to VMware's Human Resources (Brian Almas and Michelle Brennan), Insley, and Martinez, and was told that they had brought this matter to the attention of the Audit Committee of VMware's Board of Directors. In fact, everyone who conducted the 2008 investigation led by Houck was forced out of VMware.

119.    Thus at all times relevant hereto, each Defendant "knew" or acted "knowingly," as those terms are defined in 31 U.S.C. section 3729, subdivision (b)(1), in making, presenting, or submitting false claims. In that respect, each Defendant acted:

(a)     With actual knowledge of the information; or

(b)     In deliberate ignorance of the truth or falsity of the information; or

(c)     With reckless disregard of the truth or falsity of the information.

120.    This case demonstrates a carefully orchestrated scam designed to abscond with taxpayer dollars.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### On Behalf Of The United States Federal False Claims Act, Presenting False Claims

#### 31 U.S.C. § 3729(a)(1)(A)

121.    Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 120 of this Complaint as though fully set forth herein.

122.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to be presented false claims for payment or approval to an officer or employee of the United States.

123.    Through the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1)(A)(this provision replaces 31 U.S.C. § 3729(a)(1), which was in effect until the False Claims Act was amended on May 20, 2009).

124.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## SECOND CAUSE OF ACTION

### On Behalf of the United States Federal False Claims Act,

### Making or Using False Records or Statements Material to Payment or Approval of False

### Claims 31 U.S.C. § 3729(a)(1)(B)

125.    Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 120 of this Complaint as though fully set forth herein.

126.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

127.    Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false or fraudulent records and statements material to a false and fraudulent claim, within the meaning of 31 U.S.C. § 3729(a)(1)(B)(this provision replaces 31 U.S.C. § 3729(a)(2), which was in effect until the False Claims Act was amended on May 20, 2009).

128.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

## THIRD CAUSE OF ACTION

**On Behalf of the United States Federal False Claims Act, Conspiracy to Commit Violations 31 U.S.C. § 3729(a)(1)(C)**

129.     Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 120 of this Complaint as though fully set forth herein.

130.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) conspired to commit violations of substantive portions of the False Claims Act, including but not limited to subparagraphs (A), (B), and (G) of 31 U.S.C. § 3729.

131.     Defendants conspired to: (1) knowingly present false records and statements; (2) knowingly make, use, and/or cause to be made and used false records and statements; and (3) knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.  The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

/ / /

## FOURTH CAUSE OF ACTION

### (In the Alternative)

### On Behalf of the United States Federal False Claims Act,

### Retention of Proceeds to Which Not Entitled

### 31 U.S.C. § 3729(a)(1)(G)

132.    Plaintiff incorporates by reference and realleges all of the allegations contained in paragraphs 1 through 120 of this Complaint as though fully set forth herein.

133.    In the alternative, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

134.    As discussed above, Defendants received far more money from the Government than they were entitled to.  Defendants knew that they had received more money than they were entitled to, and avoided their obligation to return the excess money to the Government.

135.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

### A.    Dane Smith's Personal Claims Against Vmware For Wrongful Retaliation And Termination

136.    Smith repeats and realleges each and every allegation contained in paragraphs 1 through 120 above as though fully set forth herein.

137.    Smith alleges that Defendant VMware has wrongfully retaliated against him in violation of (i) the federal False Claims Act (31 U.S.C. § 3729), and (ii) fundamental public policy.

138.   On or about October 15, 2008, VMware wrongfully demoted Dane Smith from his position of Vice President of the Americas to Vice President of Systems Integration and Outsourcing ("VP of SIO"). In addition, VMware stripped away Smith's ability to make commissions. The position of VP of SIO lacked any "over the goal" commissions on sales which had been afforded to the Vice President of Americas and which accounted for additional compensation to Smith (the "First Demotion").

139.   VMware demoted Smith in order to neutralize his efforts to investigate reports made to him by his sales team that the United States Government was not receiving the best price on VMware products. Rather than allow Smith to pursue his investigation into the matter and continue to make reports and provide warnings to upper management, and more importantly, to take affirmative action to correct the situation by replacing Aileen Black with an ethical manager and eliminating the discriminatory pricing programs she was implementing for the federal government, VMware demoted Smith to a position within the company where he had no authority concerning the sales of VMware products to the United States Government.

140.   This wrongful demotion occurred in 2008 after Smith had made it known to upper management, the Human Resources department, and other key peers and staff members that he would be making organizational changes inside of the Federal Sales Organization to correct the pricing and contractual problems.

141.   The demotion of Smith to the position of VP of SIO was done by VMware in direct response to Smith's verbal complaints about unfair government pricing practices to his manager, Carl Eschenbach, written emails and verbal conversations with VMware's Director of Human Resources Brian Almas, as well as, the Americas Sr HR Manager Paul Velky. Additionally, written emails were sent by Smith to VMware's legal and human resource departments about the wrongful retaliatory firing of Marie O'Brien. O'Brien was fired by

41

VMware because she had complained in writing to her supervisor, Richard Gerrafo, about conduct and activities that she perceived as SOX violations and unfair pricing practices. O'Brien worked out of the VMware Federal Government Sales office. O'Brien had an exceptional federal sales track record, unquestionable integrity, and had experience cleaning up GSA pricing issues like VMware was experiencing. Smith had informed several senior executives of his intentions to manage Aileen Black out of the organization and replace her with the more experienced O'Brien, but he was demoted before he could execute on his plan to clean up the VMware Federal Government Sales office.

142.    On or about, January 30, 2009, Smith met with Susan Insley, the newly hired Vice President of Internal Audit and Compliance. Smith was told by Insley that VMware had received Smith's written complaints and very detailed documentation concerning federal unfair pricing practices and other HR issues, and that Insley was conducting a "cultural" investigation of Eschenbach and the VMware sales organization with considerable focus on the conduct of Eschenbach and Black and her federal sales team. Susan Insley reported directly to the Audit Committee of the Board of Directors of VMware, as well as, to the CFO Mark Peek. Smith, among other key witnesses, fully cooperated with Susan Insley in her investigation. Over the course of the next year, Smith would have numerous phone calls and conversations with Insley and her colleague, Lori Martinez, some of which lasted up to 8 hours per session. Often, they would meet "off site" at undisclosed locations. Smith also exchanged numerous emails Martinez and Insley about his investigation of the VMware Federal Sales organization in which Smith expressed his concerns, inter alia, that VMware might be violating the law with regard to unfair pricing to the US Government, "Channel Stuffing" and other possible SOX violations. Insley repeatedly confirmed verbally and in writing that she would share Smith's notes, documentation, and recommendations with the VMware upper management team including Paul Maritz, then

CEO, Tod Nielsen, then COO and President, Mark Peek then CFO, as well as the audit committee of VMwares' Board of Directors.   Insley told Smith that the only key executive missing in the information exchange would be Joe Tucci, Chairman of the Board, but that he would be informed later if the above executives felt that he should be.   Insley later confirmed to Smith that she had presented her investigation and findings to her direct and indirect management chain and that it was "in Executive Management's hands to do anything further."

143.    In or about August, 2009, Smith became aware of possible SOX violations concerning the last minute, second quarter, booking of a $400,000 purchase by a new distributor in Asia for an end-user called Maxis.   Maxis was an outsourced client of IBM.   IBM had already paid VMware $20 million for ELAs which could be used by IBM's outsourced clients.   As a result, from IBM's perspective, there was no need to purchase ELAs from this new distributor for Maxis to use, because in essence, IBM already had ELAs "in stock" that it could provide Maxis.   Smith investigated the situation and wrote Carl Eschenbach an email dated September 3, 2009, wherein he reported that IBM was extremely upset when it learned that Maxis received a better deal through this new distributor than IBM has received on its $20 million purchase of unlimited ELAs.   Smith informed Mr. Eschenbach that he was actively investigating the matter.

144.    On November 5, 2009, the VMware Senior Field Leadership Team lead by Eschenbach as EVP of Field Operations (which included Smith in his position as VP-SIO) held their Quarterly meeting.   Smith prepared a presentation addressing strategic planning for his area of responsibility, Systems Integration and Outsourcing.   In the context of that presentation, Smith included a discussion about his investigation into the Maxis de-booking matter, his concern that it might constitute a Sox violation problem, and how it had developed.   Many of the executives in attendance wanted to talk about the issues and how to prevent it from happening again.   However, Eschenbach reacted negatively and became very upset with Smith.   During the

43

presentation, Eschenbach interrupted Smith and attempted to force him to move on to a different subject. When Smith continued to present on the Maxis issue, Eschenbach again interrupted Smith and declared "we have investigated this, and there are no issues--now move on."  Within days after the Field Leadership Quarterly meeting, Smith began to suffer systematic retaliation for his presentation on the Maxis de-booking issue and potential SOX violation.  Smith was excommunicated by the Senior Field Leadership Team and not invited to any of the usual meetings.  No one would talk to him within the Field Leadership organization.  His office at VMware headquarters was taken away from him and his personal belongings removed without his consent.  Because of Smith's presentation of the potential SOX violations in connection with the Maxis de-booking debacle, Eschenbach initiated a full scale retaliation against Smith.

145.     On or about October 1, 2009, Smith submitted his Q3-2009 SOX Sales Certification Disclosure Statement to VMware. In the Q3-2009 Sox Certification, Smith responded to form questions about possible securities issues and provided VMware with information that he believed that there were possible SOX violations in connection with the improper recognition of revenue due to the highly questionable Maxis sale which was both a work-around of the global deal already in place with IBM and tantamount to "channel stuffing." VMware had shipped to the distributor and booked revenue on the Maxis sale even though it knew that the Maxis order was essentially speculative.  The distributor was counting on IBM paying it for the Maxis product, but the IBM refused because it already had paid $20 million for VMware ELAs which could be used with IBM's outsourced clients such as Maxis.  The Maxis deal through the distributor was later reversed in the September, 2009, timeframe and the revenues de-booked at the request of the distributor because it could not pay for the ELAs. VMware was forced to allow the distributor to return the product, in contravention of VMware's stated no-return policy.

44

146.    When Smith submitted his Q3-2009 SOX Sales Certification Disclosure Statement to VMware, he had a good faith belief that the circumstances he was reporting were violations of SOX and that he was required to report those events to the management of VMware.

147.    On October 8, 2009, Smith received an email from Susan Insley, the in-house auditor, regarding Smith's Q3-2009 Sox report which confirmed receipt of his report.

148.    On December 9, 2009, Smith wrote an email to Susan Insley informing her that as a result of making the Q3-2009 Sox report, he was being retaliated against by his supervisor, Carl Eschenbach.  He stated that Eschenbach had starved him of resources which made it impossible to do his work.  In addition, he was asked to vacate his office and when he declined, his personal belongings were moved out without his permission.

149.    On December 11, 2009, Smith was informed in writing by Carl Eschenbach that he was removed from his position on the Worldwide Senior Field Leadership Team and was to report to Gary Green in the Alliances organization.  This was a significant demotion (the "Second Demotion.")  There was no reason given for this demotion except that Eschenbach explained, "There are large scale organizational changes in motion which have been in the works for some time."  The Second Demotion moved Smith from a division where he was heavily involved with Global Strategic Sales to a completely different division of the company which was losing money and performing contracting and product activities.  Smith had no experience or skill set which would make him suitable for any position in the Alliances Group.

150.    Unknown to Smith at the time of his Second Demotion, but known by Carl Eschenbach, was the fact that the Alliances Group was scheduled for a reduction in force in Q1-2010.  Eschenbach intentionally demoted and transferred Smith to the Alliances Group in December, 2009, in order to sweep him out of the company in the planned reduction in force.

45

151.    The Second Demotion and transfer to the Alliances Group was done by Eschenbach in retaliation for Smith's submission of the Q3-2009 SOX Sales Certification Disclosure Statement to VMware and participated in the investigation into the Maxis de-booking and channel stuffing.

152.    The Second Demotion and transfer to a position that was scheduled to be eliminated was a pretext and attempt to conceal the real retaliatory reason which was because Smith was engaged in a protected activity and Eschenbach was well aware of that. The motivating reason for demoting Smith to the Alliances Group which Eschenbach knew was schedule for a significant reduction in force was because Smith had made a good faith report of perceived SOX violations which implicated Eschenbach. Accordingly, Smith's termination under the reduction in force constitutes wrongful termination in violation of public policy.

153.    Smith was terminated on January 14, 2010, only 33 days after Eschenbach demoted and transferred him to the ill-fated Alliances Group, and while he was still engaged in assisting Susan Insley with her investigation into the Maxis de-booking and channel stuffing matter. Said termination caused Smith significant anguish and emotional upset, and has damaged his career.

154.    On August 11, 2009, in connection with a law suit brought by John Wheeler against VMware for age discrimination and wrongful termination, Smith gave a deposition wherein he testified that he was aware of "Channel Stuffing" and SOX violations committed by VMware and that he had reported his concerns regarding those violations to many people in the VMware organization. Smith also testified that he expressed concerns about SOX violations to his supervisor, Carl Eschenbach, and to Steve Houck's direct reports, Brandon Sweeney, Joel Davis and Leigh Madden. Smith also testified during his deposition that he expressed concerns about SOX violations by VMware to his supervisor, Carl Echenbach. Instead of taking any

46

action, Carl Echenbach ignored Smith's concern.  Later, Carl Eschenbach disclosed Smith's

expressed concerns over SOX violations by VMware to his supervisors and used those concerns

to get Smith's terminated.

155.    On August 21, 2009, John Wheeler emailed the deposition transcript of Dane

Smith to the CEO of VMware, Paul Maritz.  In his email to Mr. Maritz, John Wheeler stated, "*I*

*felt as a courtesy, I would share it with you so that you can understand what I am saying to be*

*the truth concerning the Sarbanes Oxley violations....Please review pages 158-173 which*

*addresses the Sarbanes Oxley testimony.*"

156.    After Smith testified in the deposition of SOX violations and submitted the Q3-

2009 SOX Certification, he was subjected to a series of adverse employment actions.  Smith's

compensation plan was changed and reduced again, he received no merit increases or bonuses,

had ceased to receive regular stock option grants, and all of his direct report employees were

removed from him.  In addition, in late December, 2009, Smith was suddenly and without

advance notice, moved from the Worldwide Senior Field Leadership team to the "Alliance

Partner Group" and required to report to "Alliance" managers who had previously been

subordinate to him. There was no justifiable business reason for moving Smith to the Alliance

Partner Group.

157.    On or about January 1, 2010, Smith submitted his Q4-2009 SOX Sales

Certification Disclosure Statement to VMware.   Smith responded to form questions about

possible securities issues and provided VMware with information that he believed that there

were possible SOX violations in connection with the improper recognition of revenue due to

highly questionable sales which were "channel stuffing." In specific, Smith identified

recognition of $2 million in revenues on nothing more than channel inventory in violation of

VMware's own internal Revenue Recognition Policy.

158.    When Smith submitted his Q4-2009 SOX Sales Certification Disclosure

Statement to VMware, he had a good faith belief that the matters reported therein were violations

of SOX and that he was required to report those events to the management of VMware.

159.    In the January 1, 2010, Q4-2009 SOX Sales Certification Disclosure Statement to

VMware, Smith identified with great specificity one instance of "channel stuffing."   Smith

wrote:

> VMware stuffed the VAR (value added reseller) with $2M in net new
> license inventory (not assets used in hosting) at 60% off and 19% of net on
> SnS, they in turn immediately started selling the licenses to customers in
> their geography at over 40-50% better pricing than their peer VARs could
> buy at......We recognized a $2M booking and revenues up front on what
> is nothing more than channel inventory.....VMW knowingly sold $2M in
> license inventory and 3 years worth of SnS at huge discounts, and looked
> the other way, while that VAR that was supposed to act as a hoster and
> host the licenses and clients in their data center, but instead, took 3yrs of
> assets used for hosting and made them channel inventory and sold them
> off in less than 1 yr making an average of 30+% margins over their
> competing VARs. We took $2M upfront, vs treating it like channel
> inventory and recognizing it on sales out.

160.    On January 5, 2010, Susan Insley of the Auditor's Department sent Smith written

confirmation of receipt of his Q4-2009 SOX Sales Certification and she requested additional

information from him about the "channel stuffing."

161.    On January 13, 2010, Smith wrote Insley an email wherein he stated that he had

experienced repeated retaliation because he was helping her and Martinez in their investigation

and feared further retaliation against himself and other the innocent employees who had come to

Smith over the channel stuffing and revenue recognition issues.

162.    On January 14, 2010, VMware terminated Smith removing him from a meeting

with clients that had flown cross country to spend the day with him and taking him to a remote

conference room and delivering to him a written Notice that his position at VMware was being

eliminated as of March 15, 2010, due to a reduction in force of the Alliances Group. Gary Green and Parag Patel, Alliance Managers, escorted a man and woman into the room that Smith was unfamiliar with whereby these two informed Smith he was being removed from his position.

163.   Smith was the only executive in the Alliances Group who was impacted by the reduction in force. None of the executives in the Worldwide Global Sales organization were adversely affected. Only nine other employees over the age of 40 were impacted by the Alliances Group reduction in force, and none of them were near the senior level of Smith

164.   At the time that VMware demoted Dane Smith to the Alliances Group in December, 2009 (the Second Demotion), VMware had already scheduled not less than 54 employees of that department to be terminated in a planned reduction in force ("RIF") beginning in February, 2010. This was reflected in a notice sent to the Equal Employment Department of California. Eschenbach demoted Smith to that division knowing full well that it was subject to an imminent RIF.

165.   There was no business reason or necessity for demoting Dane Smith to the Alliances Group, which had been scheduled for a RIF. The only possible reason for demoting Dane Smith into the Alliance Group was to retaliate against him for the submission of Sox reports which implicated Carl Eschenbach and VMware in possible securities laws violations.

166.   While the RIF may have been legitimate, it was improperly manipulated by Eschenbach to cover up the sham retaliatory termination of Smith. In addition, Eschenbach had previously shared with his inner circle staff members that his preferred tactic of removing "trouble makers" from the Company was by means of a "RIF" and then not refilling their role for 6 months to avoid breaking California HR laws.

167.   After receiving notice of his termination on January 14, 2010, Smith was escorted from the VMware business offices located in Palo Alto and not allowed to recover any of his

49

personal belongings. He was stripped of his badge, cellphone, notebook and calendar, and his keys and told not to return to the facility.

168.    The two new persons informed Smith that they were to search Smith's person and personal belongings, accusing him of withholding additional materials. Smith refused to participate, and started to leave the remote conference room, whereby the man and woman stood in front of the door to prevent him from leaving. Smith informed them that just like he would have to trust them to send his belongings, they would have to trust that Smith's attorney would ship any materials that Smith might have at his home office to his Attorney Jeffrey Ryan, and Mr. Ryan would then immediately deliver them to VMware, which he did. Smith was treated like a criminal even though he had done nothing wrong.

169.    On information and belief, Smith alleges that no other VMware employee involved in the RIF was treated in the same harsh manner as if he/she was being terminated for cause. Smith was intentionally humiliated by VMware in front of clients and co-workers, causing Smith to suffer great disgrace, mortification, and embarrassment.

170.    VMware's stated reason for terminating Dane Smith was that it was part of a reduction of work force impacting only the Alliances Group. This stated reason was a fraud on Smith. It was invented to cover-up the retaliation against Smith because he was engaged in activity protected by the Sarbanes-Oxley Act (18 U.S.C. § 1514A). VMware understood and knew that Smith was engaged in protected activity on the date of the Second Demotion and his sham termination.

/ / /

### FIFTH CAUSE OF ACTION

#### Dane Smith Against VMware

#### Wrongful Retaliation in Violation of the False Claims Act

#### 31 U.S.C. § 3730(h)

171.   Smith repeats and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

172.   VMware is covered by this retaliatory discharge statute, 31 U.S.C. §3730(h), because it sells information technology products and services to the federal government.

173.   Through reporting, investigating, complaining of, and attempting to stop the fraudulent conduct of Defendant VMware, Smith was demoted twice, retaliated against, threatened, discharged and discriminated against in the terms and conditions of his employment by VMware because of lawful and protected conduct and acts done by Smith in furtherance of an action under section 31 U.S.C. § 3729.

174.   Smith is entitled to all relief necessary to make him whole, including but not limited to reinstatement with the same seniority to the position he had before the unlawful termination, total target compensation plus prejudgment interest through trial as Vice President and General Manager of Americas Field Operations from 2008 to present plus prejudgment interest through trial, over-goal commissions from 2008 to present plus prejudgment interest through trial, annual merit increases from 2008 to present plus prejudgment interest through trial, continuation of all benefits from 2008 to present plus prejudgment interest through trial, two times the amount of back pay lost, annual merit increases that were earned but unpaid for 2008, 2009, and 2010, prejudgment interest on the back pay, payment for the gains earned on non-qualified and restricted stock options, payment for the gains earned on non-qualified stock options and restricted stock units which were earned but not received, damage to his reputation

51

and ability to find comparable employment in the future, compensation for any other special damages sustained as a result of discrimination, and attorney's fees and costs.

### SIXTH CAUSE OF ACTION

**Dane Smith Against VMware for Wrongful Termination in**

**Violation of Public Policy**

175.    Smith repeats and realleges each and every allegation contained in paragraphs 1 through 170 above as though fully set forth herein.

176.    From the time period beginning in 2009 through January 14, 2010, Smith engaged in conduct, activity, acts, investigation, communications, reporting and the filing of Certificates required as a matter of his employment and by law which were protected under Sarbanes-Oxley Act (18 U.S.C. § 1514A hereinafter referred to as "SOX"), and various other established fundamental public policies inuring to the benefit of the public at large and reflected in statutory and regulatory provisions including Section 10(b) of the Securities Exchange Act ("the Act") of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and SEC Rules 17 CFR §§ 240.13b2-1 and 13b2-2.

177.    When Smith made his quarterly Sox reports to VMware, and assisted Susan Insley in her investigations of his reports, VMware knew and understood that Smith was engaged in said protected activity pursuant to SOX, and various other established fundamental public policies inuring to the benefit of the public at large and reflected in statutory and regulatory provisions including Section 10(b) of the Securities Exchange Act ("the Act") of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and SEC Rules 17 CFR §§ 240.13b2-1 and 13b2-2.

178.    Smith suffered repeated and significant adverse employment actions in the form of threats, hostile workforce harassment, discrimination, retaliation, demotions, and termination

of employment as a result of engaging in the protected conduct, activity, acts, investigation, communications and the filing of SOX Sales Certification Disclosure Statements which were protected under SOX.

179.    The facts, evidence and circumstances surrounding of Smith's sham termination suggest that the protected conduct, activity, acts, investigation, communications and the filing of the SOX Sales Certification Disclosure Statements were a motivating and contributing factor in the termination of Smith's employment from VMware.

180.    In doing the things herein alleged, Defendant VMware took numerous adverse employment actions against Smith and threatened, harassed, demoted and discriminated against Smith in the terms and conditions of his employment and ultimately terminated that employment.

181.    VMware's retaliatory conduct toward Smith was in violation of public policies pursuant to SOX, and various other established fundamental public policies inuring to the benefit of the public at large and reflected in statutory and regulatory provisions including Section 10(b) of the Securities Exchange Act ("the Act") of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and SEC Rules 17 CFR §§ 240.13b2-1 and 13b2-2.

182.    In doing the actions and things herein alleged, Defendant violated public policy meant to protect Smith by retaliating against Smith, including creating an intolerable working environment, demoting him and ultimately terminating his employment on the pretext of the 2010 Alliances Group RIF.

183.    As a direct and proximate cause of Defendant VMware's wrongful retaliatory conduct, Smith has suffered damages, including, but not limited to, loss of salary, commissions, annual merit increases, benefits, incentive and restricted stock options, and other valuable employee benefits. Additionally, the actions of defendant VMware were carried out in a deliberate manner in conscious disregard of the rights of Smith and were malicious, despicable

53

and were intended to harm him.  Smith is therefore entitled to punitive damages against Defendant VMware in an amount sufficient to punish defendant, and to deter future similar misconduct.

## IX.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, by and through Relator Dane Smith, pray judgment in their favor and against Defendants as follows:

1.     That judgment be entered in favor of plaintiff UNITED STATES OF AMERICA ex rel. DANE SMITH, and against Defendants VMware, INC. and CARAHSOFT TECHNOLOGY CORP., according to proof, as follows:

  a.   On the **First Cause of Action** (Presenting False Claims (31 U.S.C. § 3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

   i.     Triple the amount of damages sustained by the Government;

   ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

   iii.   Recovery of costs;

   iv.    Pre- and post-judgment interest;

   v.     Such other and further relief as the Court deems just and proper;

  b.   On the **Second Cause of Action** (False Claims Act; Making or Using False Records or Statements Material to Payment or Approval of False Claims (31 U.S.C. § 3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

   i.     Triple the amount of damages sustained by the Government;

      ii.     Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.     Such other and further relief as the Court deems just and proper;

c.     On the **Third Cause of Action** (False Claims Act; Conspiracy to Commit Violations (31 U.S.C. § 3729(a)(1)(C))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

      i.     Triple the amount of damages sustained by the Government;

      ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.     Such other and further relief as the Court deems just and proper; and

d.     On the **Fourth Cause of Action** (False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(1)(G))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

      i.     Triple the amount of damages sustained by the Government;

      ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.     Such other and further relief as the Court deems just and proper.

2.      Further, Relator Dane Smith, on his own behalf, pursuant to 31 U.S.C. section 3730(d), requests that he receive the maximum amount as permitted by law, of the proceeds resulting from this action or settlement of this action collected by the United States, plus an amount for reasonable expenses incurred, plus Relator's attorneys' fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not named as parties to this action.

3.      Further, Smith, on his own behalf, as to the **Fifth and Sixth Causes of Action**, requests that, as a result of VMware's wrongful and unlawful employment actions against him, that he receive all relief necessary to make him whole pursuant to 31 U.S.C. § 3730(h), including reinstatement, lost earnings, commissions, merit increases, benefits, back-pay, interest, losses on stock options, damage to reputation and other consequential damages, compensation for any other special damages, double damages, and attorneys' fees and costs as allowed by law.

4.      That, as a result of VMware's wrongful violation of public policy, Smith receive all relief necessary to make him whole pursuant to federal and state law, including punitive damages.

5.      That Relator, Dane Smith, be awarded all costs and expenses related to or concerning the Fifth Cause of Action , including attorneys' fees and expenses; and

6. That Relator, Dane Smith, recover such other and further relief as the Court deems just and proper.

Dated: April ⌐, 2014                    **FRIEDLANDER, FRIEDLANDER & EARMAN, P.C.**

By:     _____
        MARK P. FRIEDLANDER, JR.
        1364 Beverly Road, Suite 201
        McLean, Virginia 22101
        Tel: (703) 893-9600 / Fax: (703) 893-9650
        mpfriedlander@verizon.net

56

**COTCHETT, PITRE & McCARTHY, LLP**
    NIALL P. McCARTHY (admitted *pro hac vice*)
    JUSTIN T. BERGER (admitted *pro hac vice*)
    ERIC J. BUESCHER (admitted *pro hac vice*)
    840 Malcolm Road
    Burlingame, California  94010
    Tel:  (650) 697-6000 / Fax:  (650) 692-3606
    nmccarthy@cpmlegal.com
    jberger@cpmlegal.com
    ebuescher@cpmlegal.com

**LAW OFFICES OF JEFFREY F. RYAN**
    JEFFREY F. RYAN
    455 North Whisman Road, Suite 200
    Mountain View, California  94043
    Tel:  (650) 691-1430 / Fax:  (650) 968-2685
    jeff@jeffreyryanlaw.com

*Attorneys for Qui Tam Plaintiff Dane Smith*

## DEMAND FOR JURY TRIAL

Please take notice that Relator Dane Smith demands a trial by jury in this action.

Dated: April 3, 2014

**FRIEDLANDER, FRIEDLANDER & EARMAN, P.C.**

By: _____

MARK P. FRIEDLANDER, JR.
1364 Beverly Road, Suite 201
McLean, Virginia 22101
Tel: (703) 893-9600 / Fax: (703) 893-9650
mpfriedlander@verizon.net

**COTCHETT, PITRE & McCARTHY, LLP**

NIALL P. McCARTHY (admitted *pro hac vice*)
JUSTIN T. BERGER (admitted *pro hac vice*)
ERIC J. BUESCHER (admitted *pro hac vice*)
840 Malcolm Road
Burlingame, California 94010
Tel: (650) 697-6000 / Fax: (650) 692-3606
nmccarthy@cpmlegal.com
jberger@cpmlegal.com
ebuescher@cpmlegal.com

**LAW OFFICES OF JEFFREY F. RYAN**

JEFFREY F. RYAN
455 North Whisman Road, Suite 200
Mountain View, California 94043
Tel: (650) 691-1430 / Fax: (650) 968-2685
jeff@jeffreyryanlaw.com

*Attorneys for Qui Tam Plaintiff Dane Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on this *3* day of April 2014, I filed THIRD AMENDED

COMPLAINT with the Court's CM/ECF system, which will automatically send a Notice of

Electronic Filing to the following ECF participants and counsel of record:

Mark P. Friedlander, Jr.
**FRIEDLANDER, FRIEDLANDER & EARMAN, P.C.**
1364 Beverly Road, Suite 201
McLean, Virginia  22101
Tel:  (703) 893-9600 / Fax:  (703) 893-9650
mpfriedlander@verizon.net